343 S.E.2d 324 (1986)
STATE HIGHWAY AND TRANSPORTATION COMMISSIONER OF VIRGINIA
v.
Jack A. DENNISON, et al.
Record No. 821916.
Supreme Court of Virginia.
April 25, 1986.
*325 James F. Hayes, Asst. Atty. Gen. (Gerald L. Baliles, Atty. Gen., Walter A. McFarlane, Deputy Atty. Gen., H. Ronnie Montgomery, Montgomery & Kinser, Jonesville, on brief), for appellant.
Ford C. Quillen, Gate City, for appellees.
Present: All the Justices.
POFF, Justice.
This is an appeal from a judgment confirming an award in an eminent domain proceeding. The State Highway and Transportation Commissioner of Virginia (the Commissioner) contends that the trial court should have struck two members of the panel of commissioners for cause and assigns error to certain evidentiary rulings.
Jack A. Dennison and Evelyn I. Dennison (the landowners) held title to two adjacent parcels of land lying between U.S. Route 23 and State Route 727 near the Tennessee border. Route 727 is a two-lane road, and Route 23 is divided by a median strip into four lanes. The highways serve north-south traffic and, at this point, they are parallel and only 60 feet apart. On November 7, 1978, the Commissioner recorded a certificate condemning a portion of the landowners' southern parcel. The take was required in order to construct a cross road connecting the two highways.
The landowners' southern parcel contained 0.25 acre and fronted 174 feet on Route 23 and 190 feet on Route 727. The take, which consisted of 0.08 acre in fee *326 simple and a drainage easement over 0.01 acre, was situated at the southern end of the southern parcel at a point formerly used as an entrance to that parcel from Route 23. The entrance was opposite an opening in the median strip. The take reduced the landowners' frontage on Route 23 by 62 feet. The take and a six-inch curb erected along its borders eliminated use of the former entrance.
The Commissioner filed a petition in the court below on July 10, 1979, and trial was conducted on March 31, 1982. The Commissioner's expert witness fixed the value of the take at $6,675.00 and the damage to the residue at $6,925.00. George Howard and Jerry Deskins, two expert witnesses called by the landowners, estimated the value of the take at $34,100.00 and $39,395.66, respectively, and the damage to the residue at $22,400.00 and $39,395.66, respectively. The commissioners viewed the property and returned an award of $35,000.00 for the take and $37,000.00 for the damage to the residue. The trial court overruled the Commissioner's exceptions and entered judgment confirming the award.
Over the Commissioner's challenges for cause, the trial court selected two prospective commissioners as members of the panel of nine, and the Commissioner assigns error to the rulings. Jerry McMurray identified himself as an insurance agent and acknowledged that he was Mr. Dennison's personal friend. He stated that he had sold certain personal insurance policies to Mr. Dennison but carried no business insurance on his property. Burl Jennings testified that Mr. Dennison was a personal friend and that he had built three additions to the tobacco warehouse located on the northern parcel adjacent to the parcel subject to the take. He had not had any business relations with the landowners for more than three years. Responding to questions on voir dire, McMurray and Jennings stated that they had no interest, direct or indirect, in the outcome of the case, had not formed any opinion on the issues, and were not sensible of any bias or prejudice which would prevent them from making a fair and impartial award of compensation and damages according to the law and evidence. The trial court denied the Commissioner's challenges, and the Commissioner removed them by peremptory strikes.
Noting that both were Mr. Dennison's friends, the Commissioner suggests on brief that "[i]t is only reasonable to wonder whether future maintenance of [McMurray's] insurance contracts could indeed be related to a favorable award in the instant case ... [and] whether an unfavorable award in the instant case would affect [Jennings'] opportunity to secure a subsequent construction contract with the landowners."
The power to condemn private property for public use, an incident of sovereignty, implicates the rights and obligations of the individual citizen and those of the body politic as well. "Black acre" is hallowed ground, but the owner's rights must sometimes yield to the public need. The constitution strikes an equitable balance. "[T]he General Assembly shall not pass any law... whereby private property shall be taken or damaged for public uses, without just compensation...." Va. Const. art. 1, § 11. The eminent domain statutes are designed to implement the constitutional mandate, and they must be administered in a manner which promotes confidence in the integrity of the process. Compensation must be just to the condemnor and condemnee alike. The condemnee must be fairly compensated for what is taken, and the condemnor must never be penalized because it has a "deep pocket".
In Virginia, commissioners determine what compensation is just unless otherwise provided by the statute granting the power of eminent domain. Code § 25-46.19. The procedure for calling and seating a commission is prescribed in Code § 25-46.20. If the parties are unable to agree on a panel of five or nine disinterested free holders, each party is allowed to submit a list of at least six prospective commissioners. After ruling on challenges for cause, the court *327 summons nine persons to serve on the panel. Thereafter, each party is entitled to two peremptory strikes. Inasmuch as a party to a condemnation proceeding is unlikely to select an enemy as a prospective commissioner, it is clear that the General Assembly concluded that friendship, standing alone, is not sufficient grounds for disqualification.
The Commissioner's principal concern was not the personal relationships but the business relationships the landowners had with McMurray and Jennings. We agree that a person's financial interest may be so intimately related to an issue at trial that he cannot sit indifferent in the cause. For example, in May v. Crockett, 202 Va. 438, 117 S.E.2d 648 (1961), we decided that the trial court should have excluded one of the commissioners because he owned property adjoining the property to be condemned and held an equitable interest in other property in the same project on which condemnation proceedings were pending. See also Salina v. Commonwealth, 217 Va. 92, 225 S.E.2d 199 (1976) (bank stockholder not qualified as juror to try charge of larceny from bank). On the other hand, we have approved the seating of a juror who was the plaintiff's friend and family physician. Chesapeake & O.R. Co. v. Smith, 103 Va. 326, 49 S.E. 487 (1905). And, in Deal v. Nix & Son, Inc., 206 Va. 57, 63-64, 141 S.E.2d 683, 688 (1965), we upheld a trial court's ruling that a prospective juror who "was `dealing with' the plaintiff at the time of trial" was qualified to serve.
McMurray had sold Mr. Dennison some personal insurance policies some time before the take, and Jennings had done some construction work for him three years before the take. Neither had any financial interest related to the issue they were called upon to decide. Each testified that he could serve impartially. Following a comprehensive voir dire, the trial court concluded that both were qualified. Exclusion for cause is "a matter within the sound discretion of the trial court", Waye v. Commonwealth, 219 Va. 683, 690, 251 S.E.2d 202, 206, cert. denied, 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 292 (1979), and we cannot say that the court abused its discretion.
Jerry Deskins, one of the landowners' expert witnesses, testified that he based his appraisal of the value of the take on sales of comparable land consummated in 1979, 1980, and 1981. The date of the take was November 7, 1978, and the Commissioner asks us to set the award aside on the ground that Deskins' testimony "influenced the commissioners to give an inflated value to the land taken".
The Commissioner's appraiser, who used sales prior to the take, applied a "10 percent annual" inflation factor to each sale price in making his appraisal of the Dennison property. Overruling the Commissioner's objection to Deskins' testimony, the trial court explained: "It seems to me to be reasonable that if you could inflate property within five years before the date of taking that you could deflate it within five years afterwards." Concerning two of the post-take sales upon which he relied for his appraisal, Deskins testified that he "deflated those prices 10 percent each year." Speaking of a third such sale, he said that he "deflated that 20 percent".
Courts generally agree that when property in the vicinity of the take is enhanced in value by reason of the take, sales of such property should not be used as evidence of the value of the property taken. See 5 Nichols' Law of Eminent Domain § 21.31[2], at p. 21-81 (rev. 3d ed. 1969). Enhancement is difficult to quantify, cause and effect may be conjectural, and commissioners are not at liberty to speculate on such matters.
Whether a post-take sale has been enhanced by the take is a matter which should be determined by the trial court out of the presence of the commissioners. In Tremblay v. Highway Commissioner, 212 Va. 166, 183 S.E.2d 141 (1971), the landowner offered evidence of a post-take sale. Taking judicial notice that the highway project had been publicly committed before consummation of the sale, the trial court *328 excluded the evidence. Reversing the judgment on appeal, we held that the trial court could not properly take judicial notice of a fact not in evidence. "There should have been further inquiry," we said, "and unless the Highway Commissioner had shown by cross-examination of the landowner's witness or by direct evidence that the other property had been enhanced in value by the highway project, evidence of the sale should have been admitted." Id. at 169, 183 S.E.2d at 144.
Here, the Commissioner proffered no such evidence, and we can only assume that none was available. The properties involved in the sales Deskins used were located in the vicinity of the Dennison property, but we find nothing of record to show that the construction of a cross road, 60 feet long and connecting two existing highways, influenced the prices purchasers were willing to pay for these properties.
In our view, the inflation factor employed by the appraisers for both parties was relevant to a determination of fair market value at the time of the take. Given the circumstances of this case, we find no error in the admission of Deskins' testimony.
Finally, the Commissioner contends that the trial court committed reversible error by admitting evidence of damage to the residue resulting from a reduction in access.[*]
The evidence shows that the take eliminated a driveway formerly used by Route 23 traffic as access to and from the landowners' southern parcel. Before the take, traffic north-bound could enter this driveway by turning left through an opening in the median strip. By reason of the six-inch curbing along the borders of the new cross road, such traffic will now have to turn left across the two south-bound lanes, pass through the cross road, turn right on Route 727, and enter the southern parcel on its west side. Traffic south-bound on Route 23 will have no entrance to the residue of the southern parcel. While such traffic will be able to enter the Dennisons' northern parcel as before, it will not be able to use the former driveway as an exit to Route 23. Instead, vehicles will be required to turn around and exit where they entered.
The Commissioner relies upon our decision in Highway Commissioner v. Easley, 215 Va. 197, 207 S.E.2d 870 (1974). There, we said:
[T]he owner of property abutting a public road has no right to compensation when the state, in the exercise of its police powers, reasonably regulates the flow of traffic on the highway. And the burden is on him who assails the action of the Commissioner to show that the Commissioner acted unreasonably.
Id. at 203, 207 S.E.2d at 875. See also Highway Commissioner v. Howard, 213 Va. 731, 195 S.E.2d 880 (1973) (loss of direct access caused by median strip is reasonable regulation). In Easley, the highway project called for curbing along the edge of the highway adjacent to Easley's property, and the trial court permitted the commissioners to consider evidence of loss of access as an element of damage to the residue. The curbing left four openings serving Easley's property. Finding that the landowner had produced "no evidence that the openings in the curbing would not provide ... reasonable access", 215 Va. at 204, 207 S.E.2d at 875, we reversed the judgment for the landowner.
Here, the curbing around the southern parcel left no openings from Route 23 to the residue of that parcel, and, in the opinion of the landowners' expert, this restriction of access "is going to bring on *329 major trouble". At the conclusion of all the evidence, the trial court announced that "[i]nstructions Nos. 1 thru [sic] 15 will be given without objections from either side." Instruction 14 read as follows:
The Court instructs the commissioners that the owner of land abutting a public highway is only entitled to reasonable access to his property. His rights of access are subordinate to the right of the State to control traffic over its highways. If you find that the landowners in this case will have reasonable access to the property after the construction of this project, you shall not make any awards for residue damages that might result from a change in access.
We believe this was a fair exposition of the reasonableness standard articulated in Easley, and we hold that the commissioners were properly permitted to hear and consider the evidence in question.
Finding no error in the court below, we will affirm the judgment.
Affirmed.
NOTES
[*] None of the landowners' witnesses assigned a figure to this element of damages. Their estimates were based principally upon a loss of 62 feet of main highway frontage and a loss of one-third of the quarter-acre parcel. Dennison testified that he had acquired this parcel with plans to construct a convenience store. In the opinion of the expert, the take reduced "the highest and best use of this property from high volume commercial to low volume commercial." He explained that the residue can be used only for purposes of a "[s]mall used car lot, tomb stone sales, or something of that nature."